May it please the Court, Helga Hemminger here on behalf of Guam Industrial Shipyard and Mr. Matthews Posen representing the appellants in this matter. I have two areas that I would like to address in the report today. The first issue is whether the Guam Supreme Court would void or suspend coverage as a consequence of a breach of warranty where there was, number one, evidence that they Number two, nothing in the contract required a commercial certification. Number three, nothing... In this case, at the time of the accident, there was no certification at all. That is correct. So it's not a question of saying, well, they required a Navy certification and they had a commercial certification. They had no certification at all. I mean, your client had no certification at all. We don't dispute that, Your Honor. Why isn't that pretty much the end of the case as far as that issue is concerned? Because the issue, the insurers had sought to void coverage based on a breach of an express warranty. They cite a number of cases that talk about breaches of an express warranty. Our position is that there was no... There was waiver of that express warranty. But I thought what you were arguing is that for years they accepted a commercial certification rather than a Navy certification. That's a much lower certification. So they waived compliance with the requirements of the Navy certified. But I don't see why you have any evidence that there was a waiver of all compliance, all certification. Well, that's the difficulty that we had with the different... Excuse me, the district court's opinion is because that was not an issue. Waiver of a commercial certification was not part of the contract. Excuse me, the commercial certification was not part of the contract, at least under the express warranty. If it was part of the contract, that would have been an implied warranty. And then we had to look at what caused the loss. Why did the ship sink? And it wasn't because of a lack of commercial certification. The commercial certification, all it says is this ship is capable of lifting a certain capacity of vessel. If the ship had sunk, if the dry dock had sunk at the time that it was lifting vessels, maybe we'd have a different argument today. But at the time, the dry dock was laid up, it was under repairs, we were in the process of complying with what Hager had suggested in terms of making the renovations and the repairs to the dry dock. So, the fact that they accepted the commercial certification for all those years means that they waived the right to insist on the Navy certification. That's step one. That's absolutely correct. That's where we begin the analysis. And then, if you get to the point that there was no commercial certification either, then you say, well, but for that, you have to show that there's a causal nexus to the accident? I believe so. And how do you explain that to me a little better? How do you get to that? Absolutely, because they say that there's a warranty in the policy, which was our promise to have the dry dock certified, Navy certification. So, they waived that. So, where in the policy does it say that we promise to keep it commercially certified? What they've accepted year after year, when we turn in all of our documents, is that there is a commercial certification, but there's nothing in the policy that expressly says that we are required to maintain commercial certification. The other aspect of that, too... Well, but I don't understand that. The policy says you're required to maintain Navy certification. Navy certification and commercial certification are two different certifications. Yes. Yes. Navy certification is higher, right? Correct. So, I say, well, you know, every year we've accepted the lower commercial certification, but we certainly haven't said you can be...can waive certification altogether. What evidence is there that other than an express warranty of some type was ever acceptable? Well, in terms... I mean, as I read the record, there was not anything that suggested that some type of warranty was necessary. Now, you're...if I take you at your point, you're saying we can go from one certification to another because they accepted it. But if I read the evidence, there's no evidence that other than an express warranty was ever acceptable. Never. Perhaps I'm misunderstanding Your Honor's question, but there is evidence that commercial certification was accepted year after year. Well, that isn't what I said. Even if there was commercial, it was nonetheless an express warranty or an express certification that was necessary in every situation. Never was there any evidence that any...that dropping all certifications was okay. Actually, I disagree. And I will point to... What was the evidence? That was my question. In 2010... Because I looked hard at the evidence. I didn't find it. Of course. In 2010, we submitted to... and I apologize. I'm returning to excerpt of Record 467. In 2010, we submitted a... Record 467? Record 467 in Volume 3. I'm sorry, 467 what? Excerpts of Record 467. I got that part. You said something else. Volume 3. Well, that doesn't add anything. It's 467, right? Yes. Okay. I'm there. So what is on 467 that helps? So basically, that is when we submitted the evidence of the commercial certificate that actually expired at the end of October. Yeah. So? So my point is, is that they accepted that commercial certificate fully knowing that they expired at the end of October, yet they insured the policy for the entire year. Well, they assumed that when it expires, you're going to renew it. As you had in every other year. If you read what you submitted otherwise, in each year you submitted evidence that would suggest that that certificate was going to be valid for a certain point of time, and then you renewed it again. This time you did not because you couldn't. That's correct. And so, again, I'm where is the evidence that other than an express warranty or an express certification that this is the way it is, was ever acceptable? Just based on the fact that they accepted the commercial certification that expired at the end of the year and they issued a policy for the whole year. Okay. I understand your answer. That's why I wanted to get there. And I understand the court's concern as well. And my point is more to the fact that, first of all, I think we start the analysis with the question of whether or not there's a requirement for strict compliance of a Navy certification warranty in the case law. Because then the story does end there under the U.S. Supreme Court and Wilburn Boat analysis. But we don't have any certification cases that talk about strict compliance in terms of those warranties. So then we turn to state law. Well, we do have U, don't we? U versus Albany, but that's an interesting case as well. Because in U versus Albany, that case discussed the – it really turned on Hawaii state law and the outcome was basically the same. Well, but the honest truth is that what we said is the choice of law question is irrelevant in this conclusion because Hawaii law would require strict compliance in the context of maritime insurance. And we further said, and I quote, the majority rule of strict compliance is backed by sound policy reasons. And I looked all over to try to find out if Guam had ever spoken to this, and I couldn't find anything. But I did find, or at least it seemed as if Guam usually adopts California law. In that way, they're kind of like Idaho. We're not into finding our own. They usually adopt California law, but California law requires strict compliance. So, again, I'm back. The majority rule of strict compliance should apply. Well, the majority rule would apply based on the type of warranty that you're talking about. The same court in Port Lynch in Washington District Court case talked about navigational warranties, and the court said that it's the precise type of warranties that are at issue that we have to look at. So navigational warranties, and as the U Court noted, captain's warranties, those are strict compliance. But there's another Washington District Court case that questioned whether strict compliance was applicable to all types of warranties, and that Washington District Court case talked about layup warranties. What kind? Layup warranties, where the vessel is laid up. Oh, layup. Yes. Layup warranties. So I don't think there's ever been a judicial entrenchment of law regarding strict compliance of certification warranties, in which case we do turn, as judge acknowledged, to the state law to see what the state law would be. In Guam, we did not adopt California's statutes on warranties, on how we interpret them. Well, there's a blank, isn't there? I'm sorry? There's a blank, isn't there? No, there's a, in terms of. Well, you didn't adopt California's. Did you disapprove them? There was no express disapproval in terms of legislative committee notes and hearings. But the California's warranty law was available at the time for adoption, and the legislature chose not to adopt that. And it's the legislature's prerogative to not do so. And, in fact, Guam Supreme Court has repeatedly, and I cited those cases in my brief, stated that when the legislature decides not to adopt certain provisions of the law, that's evidence of its intent not to do that. Going back now, the reason. Where do we go? Where do we look? Well, we will look to contract interpretation, basic contract interpretation. In the contract, we would enforce the terms as written. And the important part of this, the important point of this is in the U case, the contract, the warranty at issue specifically stated we will void coverage if you do not comply with the warranty. In our case, we have nothing in our contract, in our insurance policy, that gives us notice that we are going to lose our coverage for failure to keep either a Navy certification or a commercial certification. Compare that with the Marine policy, which does state that we will void your coverage if you breach any of these warranties. And I think that's a very important distinction. So, in conclusion, with respect to the Navy certification warranty, it was waived, as the district court acknowledged. The issue is whether we substantially complied by providing a commercial certification and by taking out the vessel or the dry dock when it was no longer able to be certified to perform the repairs. I think those are questions of fact for the district court to have evidentiary hearing on. I have two minutes remaining. So, if there's no more questions on this issue, I would like to address very briefly the other insurance policy that is up on appeal, which was the pollution policy. And that policy, all I can say is that was completely ambiguous, fully ambiguous. We purchased pollution coverage, and now what they are telling us is that we, based on general pollution exclusion clause number three, we do not have coverage for this vessel. And I think those... That was because there was no emission of pollutants into the water. Well, it's interesting that the question comes up, because if you take a look at the actual language of the general pollution clause, it says, it does not cover actual or potential discharge, emissions, spillage, or leakage. Whereas endorsement number 10, it does not cover discharge, dispersal, release, or escape. So, by their argument, if oil actually spilled and spewed forth from the dry dock, it still would not get coverage. What did we purchase then? That's the question. Well, but it seems to me that if you read endorsement 10, it's hard to read it and include coverage for liability incurred when no discharge, no dispersal, and I'm reading now because I'm reading the exact words, no release, and no escape ever took place. Well, I dispute that. How do I read exclusion 10 to include coverage for that? It seems to me in reading that language, there's no way to read it that it includes it when there's no discharge, no dispersal, no release, no escape. Because when you read the entire paragraph, it talks about any claim. It does not cover any claim for discharge, dispersal, release, or escape. You're not really suggesting the containers are the pollutants, are you? What I'm suggesting is by sinking 125,000 gallons of oil, whether they're contained in containers or not, is a pollution event, and that should be covered. That's what I'm suggesting. And Saltarelli versus Bob Barker? Does pollutant define? Is there anything in the definition of pollutant which would suggest that it's the containers? Absolutely. Where? Well, not in the definition of pollutant. Right, and that's what we're looking at. Well, I think that the definition of pollutant is not dispositive in terms of what actually happened. Well, I have a tough time with that given the language, but I guess I understand what you're saying. Okay, thank you. Thank you. We'll hear from the other side. May it please the Court, Andrew Downs, beloved Hauser-Bailey, appearing on behalf of the Pelley's, Zurich American Insurance Company, and Star Indemnity and Liability Company. I want to begin with one of the issues Ms. Heminger took up late in her argument, which has to do with the nature of the Romanian statutes. In particular, the California Insurance Code, for those who've had the pleasure of reading it, is a rather lengthy and detailed set of statutes. What has been adopted in comparison here in Guam is a relatively short and frankly streamlined set of statutes. While Guam does frequently borrow from California law, there are a great many portions of the California statutory scheme which were never enacted here because for whatever reason they weren't enacted. Portions were enacted, many portions were not. So I don't think the failure to enact is of any significance whatsoever. The second point also on the whole that Ms. Heminger raised had to do with the fact that the warranty and her distinction of you, that in you the warranty said coverage will be voided, while in this policy it simply says warranted, vessel will be Navy certified, Navy certification maintained. The distinction is this particular policy was written by Guam Industrial's insurance broker, Aon. In fact, it was written a number of years before my clients appeared on the scene and it morphed slightly over the years, but every year Aon came to the insurance market, found insurers willing to agree to those terms, and then arranged for those insurers to issue policies written by Aon. So to the extent that there is anything unclear about that warranty, and I don't believe there is, I believe it's extremely clear, it's created by the insurer. And that's the other thing about this warranty we have to keep in mind. It was also suggested by the insurer. It shows in the excerpts of record that back in 2002, when Guam Industrial was getting ready to put the dry dock in service, its then underwriters said we want American Bureau of Shipping classification, which is very onerous, very expensive. And Mr. Pothen, the president and CEO of Guam Industrial, went back to his broker and he said, no, you don't need ABS. We're getting the best Navy certified. Let's have Navy certification instead. That's where the whole concept of Navy certification came from here. With that, the other issue I wanted to raise was a brief discussion on the warranty issue and in particular the discussion of the cases in Washington. Washington is somewhat unusual in terms of the general common law rules for construction, simply because Washington has a statute that addresses the issue that reaches a different conclusion, changes the standard, much like Texas did in Wilburn Boat. That's one of the reasons Wilburn Boat came out the way it did, was because there was a Texas statute that treated the warranty differently. Florida is another similar state. I mean, in fact, the first line of Wilburn Boat, when I reread it in preparation, was rather striking. It says, this case raises questions concerning the power of the states to regulate the terms and conditions of marine insurance contracts. We have a state, or in this case a territory, that has not chosen to regulate the terms and conditions of marine insurance contracts. The majority rule, except where states have legislatively decided otherwise, is strict construction. I don't think there's any basis to question the conclusion Judge Gatewood reached that Guam, would this issue ever reach a Supreme Court, would conclude there is strict construction. Well, where do we go to find that conclusion? What is the controlling authority? I think the controlling authority is to look at the whole body of law. You know, Canton from 1914, Hagen-Sanchez, Commercial Union v. Flagship, Home v. Sea Connect, there's a whole series of marine cases. Federal common laws? Well, it's, yes, federal maritime common law, both before and after Wilburn Boat. And one of the things about Wilburn Boat is that despite what the Supreme Court told all of us in Wilburn Boat, the courts over the intervening close to 60 years have continued to look to that rule, because that's the general rule in most jurisdictions. It is the state law common law rule in most jurisdictions. So whether you follow state law or federal law, much as the court did in you, you get to the same place at the end of the day, and you don't have to confront the issue that was raised otherwise by Wilburn. I guess what is your response to the argument that the marine, the Navy standard was waived? We don't think it was waived, and I don't think that Judge Gatewood's conclusion that it was waived is correct. And the reason is I don't think the evidence offered was sufficient to give rise to, you know, a prima facie proof of the elements of waiver. But assuming that it was waived, there's no evidence whatsoever of any intention to waive a requirement of certification generally. Or in other words, the express warranty that there was certification. Which was the condition we and our predecessors insisted upon as a condition of ensuring floating dry docks sitting in 1,200 miles from where the bulk of the insurance market for this was San Francisco. There's no evidence that the lack of certification was in any way related to the loss? In the record before you, Your Honor, there is minimal evidence of that. Were this case to proceed to trial, there would be substantial evidence of that. But for purposes of summary judgment, we did not make that argument, and we did not offer that evidence because, frankly, I think if you were going to get to there, there would be a tribal issue. So what do you think the U.S. Supreme Court would do with regard to this issue? I think they would look to the law of the other jurisdictions. They would look to the policies behind warranties and marine insurance, which are to allow insurers to assess and manage the risk they undertake. Rather than saying, we're not going to cover certain kinds of losses. For example, we're not going to cover nuclear war. Warranties are designed to limit the scope of the overall risk the insurer takes. The court in you talks about this. It's purely difficult for marine insurers to assess their risk. Such insurers must rely on the warranties made by insurers. Because of that nature of warranties, I expect the Guam Supreme Court, if it were to look at this issue, would decide that the warranty needs to be strictly complied with. There isn't any way for us to send this to them. There is, Your Honor, but I don't think this is the type of case that would warrant that type of certification, because this is not a case of such recurrent burning interest in the territory of Guam. There are, in the 60-some years since the Organic Act, there have been no published decisions out of the territory of Guam in any level of the courts involving warranties in marine or non-marine policies. There are, I believe, and this is outside the record, so I apologize for it, there are exactly two floating dry docks in this territory, both of them owned by my opponents, one of which has been out of service for over a decade. The question is broader. It has to do with whether or not an express warranty has to be material to the breach of an express warranty, has to relate to the loss in order for coverage to be avoided. Now, that is a question that goes well beyond dry docks and applies probably to many things, and it may well be an issue as to which the Guam Supreme Court has views. It may well be, but I think the paucity of case law suggests to me that of the many issues which the Guam Supreme Court needs to address, at some point or another, as it looks at its docket, this issue is nowhere near the top. Do you think we're in as good a position to decide it as the Guam Supreme Court? I think you are. And I think Judge Gatewood was in a fairly good position, formerly, having sat on that court. I want to turn briefly to the pollution issue. There's not much I need to say that hasn't been said in the briefs, and I'm not interested in stretching things. Speaking of the pollution issue, how does dropping a barrel of crude oil into the water not constitute pollution? Because the crude oil... I wouldn't if the oil leaked, but none of the oil leaked. Whether it leaked or not, I don't know that I would want to go bathing after a bunch of... I don't know what comes off a barrel. This is not a joke. I mean, it's not really funny. I mean, you know, if you've got barrels of toxic material in the water, I have a hard... I mean, it's not exactly why I'd send my grandchildren to go bathing. So I am not sure why that is not pollution. It's not pollution for two reasons. One is practical, and the other is procedural. The practical reason it's not pollution is nothing escapes. This is a commercial harbor. This harbor is full of steel ships and steel boats, most of them owned by the Navy, that sail in and out of it all the time with whatever happens to be on their hulls. It's seawater. It's not something I'm particularly... And I live about a mile from San Francisco Bay. It's not something I'm particularly interested in bathing in either, but not because there's an oil barrel in there. If the oil had leaked, it would be a different thing. No, no, I understand. I'm not positing you're on the bay. I'm just saying let's say you had some clean water, a beach where children bathe, and all of a sudden somebody dropped 20 barrels of oil that didn't leak there. I mean I have hesitation sending my grandchildren to bathe there for quite a while. And I guess I'm not sure. I mean this was viewed as a pollution event by the Coast Guard. Why isn't this pollution? There certainly was a risk. I mean in the Clean Water Act area, Section 404 of the Clean Water Act, it's pollution if you dig up some dirt and then put it back into the water, as I recall from my days in the crime squad. Just taking this stuff up and then sticking it back into the water, that becomes pollution. Why isn't this pollution? Because this is entirely encapsulated petroleum products that never get out into the water. The only reason they were removed was a matter of basic prudence in order to raise the vessel. And, as a matter of fact, in this case we have a request for admission from Guam Industrial that there was no property damage whatsoever. And the policy triggers coverage, unlike, for example, the commercial liability policies that we see in other kinds of pollution cases. This policy triggers coverage on the occurrence of property damage. And none of the cases that are cited by either side in this case involve a pollution incident where there was no leakage or dispersal. In fact, a number of them have said as long as the pollutants are safely contained within the container, whether it is a storage basin, a drum that is illegally buried on someone's land but miraculously doesn't leak, there's no pollution. It's not until there's a release, escape, or dispersal that we have something that would be covered by this particular insurance policy. And Guam Industrial could have bought an insurance policy, they did for their other vessels, that would have given them coverage for this type of prophylactic action. They elected not to. So they did have coverage if the barrels would leak? Yes. Is there any place the policy where pollutants is defined? Pardon me? Just starting to look for that when you asked that question, Ms. Heminger. Well, I was preempted, I thought, by Ms. Heminger, because she suggested the containers would not be a pollutant, so I didn't worry about it. I understand that. I'll check in a minute. I think it is, I believe it's defined, but at the moment I must confess that I cannot find the definition. Thank you. Thank you, Your Honor. Unless the court has further questions, I will submit. I have no further questions. Okay. Thank you, Your Honor. I believe we are out of time. We'll leave it there for rebuttal. Two points in rebuttal. First, the hull policy was not drafted by Guam Industrial, it was drafted by Zurich. The particular Navy certification language was offered by Guam Industrial only in an email communication with its broker way back in 2003 when they decided they are not going to get this dry dock ABS class. The second question is that is correct. The term pollution is not defined in the policy, so there is really no formal definition of pollution. And the dumping of 125,000 gallons of oil, whether it's contained in a container, the point is it's at the bottom of the harbor where it's not supposed to be, and we had to remove it. We expected coverage. And the last point is that there is no evidence that there was additional pollution coverage available, Mr. Downs cites to the fact that the vessels, the floating cranes and the derricks and the barges were covered under a separate policy. That is correct. And most likely because those are vessels and those move about from harbor to harbor. Under the ocean marine policy here, what is covered is a stationary location. And because the dry dock is stationary, the dry dock was incorporated under that coverage. But there is no evidence that we were even offered to obtain separate coverage. Thank you. Okay.
judges: KOZINSKI, SCHROEDER, SMITH